All right, the next argued case is number 20-12-55, Chen v. Jung. Mr. Tong. Yixuan Tong of Yupati Shrek LLP for Appellant Dr. Chen. May it please the court. Dr. Chen made three significant contributions to the A-series patents. The trial judge made three errors and improperly took them all away. First, Dr. Chen custom built a cell system for structure activity relationship analysis, or SAR, and cancer drug design. The trial judge erroneously required Dr. Chen's cell system to be specific to the A-series compounds. This is a legal error because the law did not require such specificity for an inventive contribution. Second- Counselor, is it your position that the R-series, Rd-series, and A-series compounds are not chemically distinct, but the inventive process is one and the same? I can point to one particular part of the record. Dr. Sawyers testified on Appendix 469 that the Rd work defined the properties on the right-hand side that give us antagonism and give us proper pharmacokinetics. So the Rd work already solved the problem of finding a drug candidate. And then that Rd-162 right-hand side structure was put into A-52. So the entire process of getting the SAR analysis to get to Rd-162 and then using the SAR information to pick Rd-162 right-hand side structure to put into A-52, that's all part of the inventive process for A-52. Aside for if they are useful for picking a compound for doing the pyridine ring, that's on Appendix 467, also from Dr. Sawyers. Mr. Tong, this is Judge Toronto. What do you do with Dr. Sawyers' testimony that a publication, I think, was at the end of the Rd-162 to view as in the prior art the Rd system that Dr. Chen had earlier been involved in creating? First, let's just make it clear that the cell system was never actually published. Dr. Chen's cell system was described in the Rd theory compound. But Dr. Sawyers says something to the effect that the information that was published made it perfectly evident how to put the two things together. And it would have taken a few weeks or maybe a few months, but the time was just because there are a bunch of steps, but none of them was unknown. Dr. Sawyers talked about a skilled scientist or a trained biologist, but he never really described the skill level for such a person. He never said that that's ordinary skill. He never said that the weeks or many months possibly of work would just be routine. He never said that. And secondly, even if someone could do the testing, Dr. Chen has testified that his testing was so reliable and so efficient that makes the ACR analysis really practical. Otherwise, you get bad data, you will never be able to get good results. And it will take 30 years instead of the three. So there's no testimony from Dr. Sawyers against any of that. He never said if a skilled person came up with something, how reliable it will be, how efficient it will be. Dr. Chen's tests were really customized to this particular project. You don't dispute though that to the extent Dr. Chen claims that he tested any of the A-series compounds, that he never provided any results of those tests to anyone? He did not show the bar graph. That's what he meant. But he told Dr. Oock that A51 was as good as RD37. And Dr. Oock remembered that. But then he told him to destroy everything and act like they've never done it, right? That is a disputed point during trial. I understand the judge put that in the fact finding in the opinion. But when you get to the analysis part, that fact never was used by the judge to discuss the joint inventorship. Issue. Well, I think it's not disputed. Is this correct? That there was no laboratory notebook, no record of the testing that we're now told was conducted? There was electronically stored data with the label CC1. And that was not destroyed. It was in the record. But there was no identification of CC1 with this product, as I recall the undisputed record that's presented to us. That was the clear error made by the trial judge below. Because when you look at all the documentary evidence, that there's no question that CC1 is A51. Otherwise, Dr. Oock will never know about A51's good activity in June of 2005. The record says it was re-synthesized and tested again. That was in October of 2005. Yes. The only A51 sample before June of 2005 was given to Dr. Chen for testing. And there was never a second sample for anyone to test A51 before June of 2005 when Dr. Oock wrote that email. How does that affect inventorship? There's no record of what we're told was the original testing. And to the extent that there were credibility determinations, there was a good deal of testimony that it was said to be inactive. Yes. Except there is an email from June of 2005. And after analysis of all the documentary evidence, Dr. Oock could only be talking about A51's encouraging activity in that particular email. So that's our point. Yes. There's no other explanation from all the documents. The trial judge came up with the speculation to say someone else could have tested A51 but everyone agreed at trial that Dr. Chen was running the cell-based testing. He was the only one. And as we just discussed, that there was no A51 sample. There's not a second A51 sample before June for anyone to test. The problem is, counsel, that the trial judge went through every single one of the four grounds upon which you argue that Mr. Chen was an inventor and rejected everyone for both lack of evidence and insufficiency in the totality of the analysis, right? Well, actually, no. The judge put all the RD-related work in one paragraph on page eight to say, finally, all the RD series work was just buffer causation. There, he actually did not make any factual finding. He just said it's not relevant altogether. But that is a legal error because the RD162 right-hand side structure, there was no dispute Dr. Chen was involved in the ACR that leads to that structure. And there's also no dispute that from Dr. Sawyer's, the ACE-AR analysis actually was useful for picking it to do the pyridine thing. And then Dr. Oak and Dr. John both testified that once you know that there's RD162, then you can, it's a natural thing to, and it's easy to put it together with the pyridine to make something as good as RD162. That's Dr. Oak's words in 2005 on Appendix 1872. So the clear error was to, so RD162 was already the solution because Dr. Oak was just trying to make something, which is A52 later, as good as RD162. But the trial judge says everything that leading up to RD162 was a buffer causation and RD162 was just a lead compound for A52. And those are clear error and there's no underlying factual disputes on these points. I want to point out that- But when you say it's a legal error, when you say it's a legal error, I mean, there was testimony that because these compounds are chemically distinct, that it wasn't as easy as you say to go from one to the other. No, the testimony was that the two compounds are different, so they have different properties and might be unpredictable. That's why we need testing after you do the substitution. However, the inventive process itself, if we look at Dr. Oak's words, he said if A51 turned out to be as active as RD37, you combine it with RD162, one could easily make a compound as good as RD162. That's on Appendix 1872. And then on Appendix 1871, Dr. John also says in his invention disclosure that there's an A52 molecule, its activity is similar to RD162. So the- But there was also testimony, counsel, was there not testimony that it was very difficult to go from the RD left-hand ring to a pyridine ring? There's no testimony of that. There are a lot of testimony on why these two should be different. But in the actual inventive process, Dr. Oak actually said, again, that when you look at A51, there are no doubts, this is his word, no doubt in his mind that A51 has the same size and shape as RD37. And the left-hand side thinks it's a binding domain to the antigen receptor. That testimony shows us during the inventive process, the pyridine and the bending ring on the left side were viewed as same shape and size, serving same functions. And the resulting substitution, resulting in an A-series compound that would be just as good as the original, that's the RD162. All right. Let's hear from the other side. We have really better time. Thank you, honors. Okay. Mr. Subko. Good morning, your honors. Mark Subko for the FLEs and may it please the court. Some of the questions that your honors had for opposing counsel put your fingers exactly on the issue here. The decision below turned primarily on a credibility determination by Judge Klausner. He was faced with diametrically opposing stories with respect to how the A-series inventions came out. Dr. Chen said he tested A51 in February of 2005 and told Dr. Oak that results were good. Dr. Oak said that Dr. Chen initially didn't tell him about the test results and instead told him to destroy his lab notebook and conceal all the evidence of A51 and then only later said that A51 was inactive. And Dr. Jung also testified that he was told by Dr. Chen that A51 was inactive. Can I just ask you, what is the timing for Dr. Jung and Dr. Oak of what they said about Dr. Chen saying this was either active or inactive? The timing there was in February of 2005, your honor. A couple of weeks after Dr. Oak testified that he finally successfully synthesized the A51 compound. So based on the findings that Judge Klausner made, he clearly sided with Dr. Oak. That answer wasn't complete to me. So Dr. Oak synthesized A51. There's no dispute that he gave it to Dr. Chen. Is that right? That's correct, your honor. Dr. Oak, at what times did Dr. Chen tell Dr. Oak certain things about that? Dr. Oak testified that a couple of weeks after he provided the A51 sample to Dr. Chen, which would have been in the February 2005 timeframe, he asked Dr. Chen about the test results. He said it usually took two to three weeks for Dr. Chen to test the sample that he was given. And it was at that time when he asked Dr. Chen about the test results that he was told to destroy his lab notebook and conceal the evidence. Dr. Oak then said... I'm sorry, just to be clear, was it at that time that Dr. Chen said results bad? No, your honor. The testimony was that it was about a week later that Dr. Chen came back and told Dr. Oak that the test results were bad. And that was about the same time that Dr. Jung testified that he asked Dr. Chen about the test results and was also told that the test results were bad. Okay. And did there come a time when Dr. Chen, according to Dr. Oak or Dr. Jung, said the test results were good? No, your honor. The testimony was that Dr. Chen never reported successful test results for the A51 compound. It wasn't until about seven months later, after Dr. Chen had left for China, that Dr. Oak discovered that his NMR spectra of the A51 compound was missing and renewed suspicions were arisen with respect to Dr. Chen's activity. At that time, the record shows that A51 was resynthesized and at that time it was tested and the results were confirmed as good. Okay. And between the two periods we've just discussed, there occurred what is pretty central to Dr. Chen's presentation, namely, the June 2005, I don't know if it's a letter or an email or a report that I think it's Dr. Oak wrote to somebody at a commercial company that was interested in this area. And I think, as I understand it, Dr. Chen's view of that is that in that document in June of 2005, so well before the resynthesis, but after the January-February events about the original A51, that June 2005 document shows Dr. Oak saying there's this new promising thing and, according to Dr. Chen, that could only have been A51, so Dr. Oak must have heard something positive about the results. Can you address all that? Yes, Your Honor. I believe you're referring to the activation. Dr. Chen did argue that it had to be A51 that Dr. Oak was indicating had good activity because he hadn't successfully tested any other new scaffold. But the testimony was conflicting there. Dr. Oak testified that he was referring to a compound called RD-144. It was a different scaffold than the other RD series. He had replaced the central spirocyclic thiohagdantoin ring with a parazolone ring. And Dr. Oak testified that that's what he was referring to in that email. Dr. Chen said, well, that can't be because I didn't have any results for RD-144. I had a problem putting it into solution. But we know that Dr. Chen's lab notebooks were not a complete record of his testing. He admitted, for example, that he didn't document his testing of the CC1 compound in his lab notebook because it wasn't named. So we've got conflicting testimony as to what was being referred to in that email. It was Dr. Chen's obligation to come forward with clear and convincing evidence on that point, even under a rule of reason analysis. All he's done here is come up with a plausible, alternative explanation based on conflicting evidence. But that's not enough to establish clear error in the fact findings that Judge Klausner made. I think it's telling, Your Honor, that the record showed that nothing whatsoever happened between February of 2005 and October of 2005 with respect to the A-series project. That's undisputed. If Dr. Chen had truly reported positive results from his testing of A51, one would have expected that somebody would have said something or did something during those eight months to pursue the development of the A-series compound. So that absence of evidence there is evidence that further supports the district court's credibility determination that Dr. Chen never communicated positive test results for the A51 compound to anyone at UCLA. Counsel, the trial court made credibility Dr. Chen's own testimony as it relates to the pyridine substitution and the testing and pointed out that everyone disputed his testimony and there was no record. But what about the issue of going from the RD series to the A-series and counsel's argument or your friend on the other side arguing that it really wasn't a big leap and that once he participated in the RD series development, which everyone concedes, that he therefore should automatically be entitled to inventorship on the A-series compounds? Your Honor, I think the record shows that it was a significant leap to go from either the RD-37 compound to A51. There was testimony from Dr. Uk and also from Dr. Winkler, the defendant's technical expert, that this was a very significant chemical structural change, replacing the left-hand heterocyclic ring with the pyridine ring. The inventors had a rationale for why that would result in significantly better binding properties with respect to this new compound. But it's also important to note how these two different compounds came about. Dr. Chen's theory is because he contributed to the RD series compounds, the development of those, that necessarily if there's anything in common between the RD compounds and the A-series compounds, he must be an inventor. The A-series compounds came about as the result of a very different inventive process. According to the testimony of Dr. Jung and Dr. Uk, they were trying to solve a very specific problem. There was a concern about a potential patentability problem with regard to the RD series patents. There was a concern in view of a Roussel-Ukleff patent. The chemist, Dr. Uk... Can I just say, just before you go on, is the Roussel-Ukleff patent that was of concern the 5589497 or some different patent? I believe that's correct, Your Honor. Okay. But the issue there was that there was a concern that the chemist had that there may be a patentability problem. It turned out ultimately not to be an issue. But at the time, they were trying to solve that particular problem. They were trying to come up with a chemical structure that would be effective for treating prostate cancer that would be outside of those patents. That was the reason why Dr. Jung testified that he called the August 2004 meeting. The testimony was that Dr. Uk came to that meeting with an idea for an alternative chemical structure, one that would have a heterocyclic ring on the left-hand side in the Rd-series compounds in combination with the spirocyclic thiodanktoin and also the right-hand arrow ring. He came to that meeting with that idea to solve this particular problem. Does it matter that that's not a scientific problem but a legal freedom problem? I don't believe it makes any difference as to why the inventors were looking at making a change. Their motivation isn't relevant to the conception that they came up with. Dr. Jung and Dr. Uk came up with the concept of the chemical structure for the A51 compound in connection with that August 2004 meeting. There's a document that Dr. Jung had prepared shortly after that meeting that lays out his rationale, shows the structures there. There's nothing in the record other than Dr. Chen's uncorroborated testimony that he contributed to that. Again, Judge Klausner made a credibility determination that he did not contribute to the chemical structure of the A-series compounds. Is that the point that Dr. Chen argued below but doesn't really argue or appeal? Yes, Your Honor. It appears that Dr. Chen has abandoned the theory that he was the one who identified the chemical structure or he was the one who came up with the chemical structure. We don't have any evidence that Dr. Chen contributed to the conception. We have no evidence and, in fact, the district court made a credibility determination that he never communicated positive test results regarding the A-series compound, the A51 compound, to anyone at UCLA. Without him having communicated positive test results, there's no collaboration of the type that this court's precedent requires for joint inventorship. There's no communication between the named inventors and Dr. Chen about the specific invention that's covered by the A-series patents. Do you agree that testing, had it occurred and had it turned out to be positive, would have been at least relevant to at least those claims in the three patents at issue that seem to require some positive performance of the structure, even if he didn't contribute to the identification of the structure? We don't have any record of that, Your Honor, partly because of the way that Dr. Chen presented his case below. He didn't identify any particular claims of any of the three A-series patents that he allegedly contributed to, but at that point, with respect to the A-series compounds, that testing would only have been confirmatory. Conception of a chemical substance, according to this court's precedent, including Burrough's Welcome, just requires knowledge of the specific chemical structure and an operative method of testing. One example, Claim 24 of the 507 requires a pharmaceutical composition comprising a therapeutically effective amount of a compound of Claim 1. That's more than here's what it is and here's how to make it. That talks about the language I used before was a positive property to which testing would seem to be relevant. As long as he made a contribution, again, this is assuming away the fact-finding about testing, but whether it would have been relevant to a single claim would have entitled him to or significant to a single claim would be enough for inventorship status on the whole patent, right? Your Honor, I would agree that... May I complete the answer to the question, Your Honor? Your Honor, I would agree that such testing would potentially be relevant. Two issues there, though. That testing only occurred after Dr. Chen was no longer there and there's no record in the trial proceedings below as to what testing was done with respect to the A-series compounds after Dr. Chen left for China. So there's not even a record that his unique testing protocol or cell lines were used for the testing. He's never established that record. If there are no other questions, I thank you for your time, Your Honors. Any more questions for Mr. Sipko? No. Nope. Okay. Thank you. And Mr. Tan, you have your rebuttal time. Regarding the left side of the structure, I want to point out that Dr. Chen's testing of A51 is a contribution for subsequent, the A-series genus, all the compounds subsequently, because that testing turned a hope or expectation that the pyridine substitution will work into a definite and permanent idea. And regarding the facts of the testing, the trial court never credited Dr. Ok's testimony that he was talking about RD-144 in that smoking email from June of 2005. And thirdly, Dr. Sawyers, after Dr. Chen testified, Dr. Sawyers testified that he said, after testing what we now to the A51, but what was called CC1, this is on Appendix 0316. So he was under his own counsel's questioning, and he just brought it out that CC1 is what we now know as A51. So that's admission on the record. So that's what I want to say about the left side. But the Dr. Chen's contribution to the right-hand side, that's the essential feature for A52. That's the solution to the problem of curing cancer. So either of the two contributions should entitle him to be a joint inventor. In the underlying cell system, which makes all this possible, is another contribution, a separate contribution, separate basis for him to be a joint inventor. I do want to discuss this court's holding in Vanderbilt a little bit. In that case, the court clarified that the contribution to a chemical compound structure does not have to be directed to the final claimed compound. So in that case, it was Tadalafil that's the final compound. But most of the analysis in this court's opinion is regarding whether the intermediary compound called GR340X, which is not in the claim, and even that intermediate compound in addressing that, in that analysis, this court actually used the term lead compound for the intermediary compound in the inventorship process. So in this case, there's no question Dr. Chen was an active participant. On Apelli's answering brief, page five, they say the joint activity, the joint analysis, and active collaboration was throughout the RD Series project. It covers RD162. And we also have Dr. John and Dr. Sawyer's email communication in July of 2005 showing that Dr. Chen was the one that gave the assessment that RD162 was the best compound in the series. And that's also corroborated by Dr. Chen's lab notebook. Counsel, what about Dr. Oaks' testimony where at 435 and 336 of the Joint Appendix where he talks about how difficult the process was? He said it was the most difficult compound that he's ever made in that lab. And he talked about because when you go from a CH bond to an end, everything in the ring changes. He said it's not that simple. Bond angles change, bond lengths change, the polarity changes. I mean, his testimony, which the court credited, was that this was a big leap. The synthesis of A51 did take some difficulties. There's no dispute of that. But the conception of the A Series compounds was not as difficult as now the defendants are arguing. I want to point to Appendix 0439 and 0440. That's when Dr. John, Dr. Oaks' boss, Dr. John is a chemist. He said, I asked him, once you have known that RD162 was quite good, then it would be natural to take the pyridine and put it with the 162, right? And he said that would be a natural thing to do. I think my time is up. Okay. Any more questions at this point for Mr. Tong? No. No. Thank you. This case is taken under submission.